## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 9:18-cv-80948-ROSENBERG/REINHART

DOROTHY KERR CHECA CHONG
on behalf of herself and all others
similarly situated,

      Plaintiff,

          v.                             **AMENDED CLASS ACTION
COMPLAINT**

NEW PENN FINANCIAL, LLC, d/b/a            **JURY DEMAND**
SHELLPOINT MORTGAGE SERVICING,

      Defendant.

_____/

### AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Dorothy Kerr Checa Chong, files this class action complaint, on behalf of herself and all others similarly situated, against Defendant New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint" or "Defendant").

### INTRODUCTION

1.     This action seeks to redress for injuries resulting directly from Defendant's force-placed, or lender-placed, insurance ("FPI" or "LPI") practices. Plaintiff and a proposed nationwide class of Shellpoint borrowers seek to recover damages they have suffered as a result of Defendant's wrongful conduct in manipulating the FPI market through collusive agreements involving kickback arrangements and other forms of improper compensation and their standard practice of charging borrowers undisclosed and illegitimate costs in connection with force-placed insurance.

2.     Shellpoint Mortgage Servicing manages (or "services") residential mortgage loans after they are originated by mortgage lenders. It collects principal, interest, and escrow payments from homeowners nationwide. Over the last few years, Shellpoint has grown to become America's 15th-largest non-bank mortgage servicer. As of April 30, 2018, Shellpoint's servicing portfolio contained 233,033 loans (excluding real estate owned properties) with an unpaid balance of approximately $57.8 billion.

3.     During the class period, Shellpoint engaged in a pattern of unlawful and unconscionable profiteering and self-dealing in the purchase and placement of FPI coverage on

behalf of Shellpoint borrowers in Florida and throughout the country. Defendant's exclusive and collusive relationship with OSC resulted in extraordinary profits totaling in the millions of dollars.

4.     Specifically, during the class period, Shellpoint entered into an exclusive agreement with insurance agent Overby-Seawell Company ("OSC") to monitor the entire Shellpoint loan portfolio and issue certificates of insurance through exclusive, single-interest master policies OSC procured through surplus lines insurers ("the FPI Insurers").[1] These exclusive master policies covered the entire Shellpoint portfolio.

5.     Because these insurers were surplus lines insurers, they did not file their rates with the state of Florida and therefore the filed rate doctrine does not apply.

6.     The FPI Insurers and OSC provided Shellpoint with various kickbacks that Defendant attempts to disguise as legitimate compensation. Upon information and belief, these kickbacks included, but were not limited to, one or more of the following: (1) unearned "commissions" paid to Shellpoint or an affiliate for work purportedly performed to procure individual policies; (2) "expense reimbursements" allegedly paid to reimburse Shellpoint for expenses it incurred in the placement of force-placed insurance coverage on homeowners; (3) free or below-cost mortgage-servicing functions that FPI Insurers and OSC performed for Shellpoint that often had nothing to do with the placement of insurance coverage; and/or (4) payment of illusory reinsurance premiums that carried no commensurate transfer of risk. Because of these kickbacks, Shellpoint essentially received a rebate on the cost of the force-placed insurance; however, Shellpoint homeowners ultimately bore the cost of these kickbacks because Defendant did not pass on these rebates to the borrowers. The charges for FPI were deducted from borrowers' escrow accounts and Defendant attempted to disguise the kickbacks as legitimate when, in fact, they were unearned, unlawful profits.

7.     During the proposed class period, Defendant treated Plaintiff and every putative class member in an identical manner pursuant to their standard policies and procedures by, among other things: (1) notifying them that their coverage had lapsed and new coverage had been forced with the same cycle of form letters; (2) forcing coverage for every borrower from one OSC procured master policy that covered Shellpoint's entire loan portfolio; (3) forcing new coverage in the same manner for every member of the proposed classes; and (4) including the same impermissible costs in the amounts charged every putative class member for coverage.

---

[1] At this stage, neither OSC nor the FPI Insurers have been named as defendants.

8.      This action seeks to redress for injuries resulting directly from Defendant's FPI practices. Plaintiff does **not** challenge Shellpoint's contractual right to obtain FPI to protect its interest in Plaintiff's loan, but instead challenges the manner in which Shellpoint manipulated the FPI process to enrich itself, the FPI Insurers and OSC at the expense of Plaintiff and the Class, and in violation of the mortgage agreements.

## PARTIES

9.      Plaintiff Dorothy Kerr Checa Chong was charged for FPI on her home in Highland Beach, Florida by Defendant Shellpoint. Pursuant to its exclusive arrangement with OSC and FPI Insurers, and the master policies in place, and upon information and belief, Shellpoint purchased the FPI coverage through OSC and FPI Insurers. Ms. Checa Chong is a citizen of the State of Florida.

10.      Shellpoint is, and was at all relevant times, a limited liability company organized under the laws of Delaware, with its principal place of business in Plymouth Meeting, Pennsylvania. Upon information and belief, Shellpoint's members reside in Pennsylvania. Therefore, Shellpoint is a citizen of Delaware and Pennsylvania. Shellpoint services residential mortgage loans in Florida and throughout the United States, including loans within this district. Shellpoint serviced the Plaintiff's loans.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

12.      Plaintiff Dorothy Kerr Checa Chong is a citizen of Florida who owns property in Florida on which insurance coverage was forced by Defendant Shellpoint through its exclusive arrangements.

13.      Shellpoint is a Delaware limited liability company, a citizen of both Delaware and Pennsylvania, and registered to do business in Florida. The amount in controversy exceeds $5,000,000 and there are at least one hundred members of the putative class.

14.      Further, pursuant to 28 U.S.C. § 1331, this Court has subject-matter jurisdiction based on Plaintiff's claims for violation of the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq*.

15.      This Court has further jurisdiction over Defendant because it is a either a foreign limited liability company authorized to conduct business in Florida, is doing business in Florida

and has registered with the Florida Secretary of State, or does sufficient business in Florida, has sufficient minimum contacts with Florida, or otherwise intentionally avails itself of the Florida consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendant and its affiliated or related entities permissible under traditional notions of fair play and substantial justice.

16.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiff and Defendant. 28 U.S.C. § 1332(d)(2). Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d) (2) is met, the claims of the putative class members are aggregated. 28 U.S.C. § 1332(d)(6).

17.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendant transact business and may be found in this District and a substantial portion of the practices complained of herein occurred in the Southern District of Florida.

18.     All conditions precedent to this action have occurred, been performed, or have been waived.

## NATURE OF THE CASE

19.     All mortgage lenders and servicers' FPI schemes operate in a materially similar fashion. When a homeowner's voluntary insurance policy lapses, the mortgage servicer force-places insurance on the property and charges the borrower inflated amounts. Borrowers are told they will be charged the cost of coverage and contract to do so, but in fact pay an amount greater than what the mortgage servicer, here Shellpoint, ultimately pays for the FPI. This is because after the servicer pays the insurer for the FPI coverage, the insurer kicks back a percentage of the payment to the servicer or one of its affiliates. The kickback essentially provides a rebate on the cost of the insurance coverage. The benefit of that rebate is not, however, passed on to the borrower.

20.     The amounts charged to borrowers for FPI coverage are also inflated to cover other costs that are properly borne by the loan servicer. These kickbacks, which are described in greater detail below, not only allow the insurer to secure an exclusive relationship with the mortgage lender or servicer and keep the market closed, but also provide the participants in the scheme with millions of dollars in ill-gotten gains—all at borrowers' expense.

21.     The amounts charged to the borrowers by Shellpoint for forced coverage often have little to do with the actual risk insured or the value of the property, and are purely a function of this kickback scheme. This action seeks compensation for borrowers who have been victimized by this practice and an end to this illegal scheme.

22.     At all relevant times, Shellpoint purchased FPI through OSC and the FPI Insurers pursuant to a longstanding agreement whereby the FPI Insurers furnished insurance coverage for the entire Shellpoint portfolio of mortgage loans under a master policy. The master policy was a single interest lender-placed global insurance policy which had less worth to borrowers and was used only to increase the profits of Shellpoint, OSC, and the FPI Insurers in the form of lower loss ratios (dollars paid per claim made). OSC facilitated the arrangement by taking over certain mortgage servicing functions on behalf of Shellpoint, at free or below cost, including tracking the loans in the Shellpoint portfolio for lapses in insurance, and notifying the FPI Insurers of any lapse so an individual certificate for the particular borrower's property could be issued under the master policy.

23.     For example, in 2014, after paying 10% (or higher) commissions for quite some time, OSC appeared to switch from paying straight commissions to Shellpoint in favor of free or below-cost servicing functions. *See* Deposition Transcript of K. Gilroy dated February 27, 2017 at 17, 27, 170-171 (attached hereto as Exhibit A).

24.     The President of OSC, Keith Gilroy, testified that Shellpoint needed to make the switch because "[t]here have been a lot of lawsuits out there with some of the larger insurance companies where banks and servicers were getting, we'll call them kickbacks, and we didn't want this to appear to be that, so the servicers they were paying, being paid -- we -- … agreed to give certain services and things away for free and to bring the account onboard, and this was -- typically OSC charges for those fees and services, so this expense reimbursement was a way to recoup those expenses in an agreement with ShellPoint." *See id*. at 17.

25.     "ShellPoint did not want to appear to be taking commissions or back-end reimbursement for an account so the structure of the account was changed so that ShellPoint would not be looked upon as trying to get kickbacks on behalf of force-placed insurance." *Id.* at 18. ShellPoint and OSC wanted it to "look as if everything was aboveboard." *Id.* at 21.

26.     Indeed, even though Shellpoint was making handsome profits off of FPI, OSC admitted that they were "trying to eliminate exposure to both the company, to ShellPoint, and not

looking as if they're, again, getting back-end commissions or making money on behalf of LPI." *See id.*

27.     OSC was collecting a "35 percent commission rate on the premium generated" for its FPI Insurers, and then passing a portion of the commission back to Shellpoint. *See id* at 24. This was a "significant part of the [OSC's] revenue." *Id.* at 32.

28.     OSC's Vice President of Accounting, was told to help hide the commission structure with Shellpoint, and instead call it an "expense reimbursement." *See* Deposition Transcript of Norman Norton dated February 28, 2017 at 15-16 (attached hereto as Exhibit B) ("I was just told that they were going to quit [taking commissions]. We were going to increase our services to them and it would, I guess, offset some of those expenses.").

29.     However, there was no real difference, other than the name, between the commissions and expense reimbursements. *See id*. at 32. ("It would be the same thing referred to in a different term.").

30.     In addition, OSC essentially gave away escrow management services where the "cost is very high" in order to "sell the account" and bring Shellpoint on board. *See id* at 145-146.

31.     Shellpoint was OSC's "largest and most profitable account." *Id.* at 190.

32.     Upon information and belief, Shellpoint terminated the agency relationship with OSC in 2015. *See* Exhibit A at 62, 86.

33.     During the class period, these arrangements returned a significant financial benefit to Shellpoint that is unrelated to any contractual or bona fide interest in protecting Shellpoint's interest in the loan. Pursuant to its agreement, Shellpoint purchased single interest insurance coverage with inflated prices from the FPI Insurers, and in exchange, Shellpoint received kickbacks from the FPI Insurers and OSC in the form of unearned "commissions," subsidies for below-cost mortgage servicing functions (that often have nothing to do with providing insurance coverage), or illusory "expense reimbursements," among other things, that amount to a rebate on the cost of the FPI to Shellpoint, and ceded premiums for riskless reinsurance. Shellpoint then imposed these inflated charges upon borrowers in amounts it claimed to represent the cost of the insurance it paid for, but in fact it was a greater amount than Shellpoint paid because the charges included the secret kickbacks and other illicit consideration that was remitted to Shellpoint and that amount to a rebate that Shellpoint did not pass on to its borrowers.

34.     Shellpoint's desire to reap greater profits through its prearranged agreements with OSC and FPI Insurers lead it to select high-priced insurance that included a rebate to Shellpoint, but subsequently charged its borrowers an amount that did not pass on the rebate. The charges Shellpoint imposed on borrowers, which Shellpoint attributed to the cost of the insurance, were not only greater than its actual cost of providing the insurance and the actual cost paid by Shellpoint, but also were usually greater than the premiums for the borrowers' voluntary insurance, even though the FPI was single-interest and typically provided less coverage. Through this manipulation of the FPI selection process, Shellpoint maximized its own profits, and those of OSC and FPI Insurers, to the detriment of Plaintiff and the Class members.

<u>**The Force-Placed Insurance Industry**</u>

35.     Lenders and mortgage servicers, like Shellpoint here, force-place insurance coverage when a borrower fails to obtain or maintain proper hazard, flood, or wind insurance coverage on property that secures a loan. Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to force-place coverage on the property to protect its interest in the loan and to charge the borrower the cost of coverage.

36.     FPI schemes like the one at issue here take advantage of the discretion afforded to the lenders and servicers in standard form mortgage agreements. The mortgage agreements typically require the borrower to carry hazard and flood insurance sufficient to cover the lender's interest in the property against damages from fire, other perils, and floods. If a homeowner's "voluntary" policy lapses, the mortgage agreement allows the lender to "force place" a new policy on the property at the borrower's expense.

37.     These schemes also violate the mortgage contract's express terms. The borrower contracts to compensate the lender for the actual cost that the lender or servicer pays the insurer for the FPI coverage, but is then charged an inflated amount – more than the lender or servicer actually paid. Typically, lenders delegate to servicers the lenders' rights to enforce the terms of the mortgage contract.

38.     FPI providers enter into exclusive relationships with servicers to provide the FPI policies. To maintain their exclusive relationships with these servicers, the FPI insurers, (i) using an insurance agency as a conduit, pay unearned kickbacks, often calculated as a percentage of the force-placed premiums and disguised as "commissions" or "expense reimbursements"; and/or together with the insurance agency, (ii) offer subsidized mortgage servicing functions; (iii) enter

into lucrative captive reinsurance deals with them; and/or (iv) provide other financial benefits not attributable to the cost of insuring the property.

39.     The money to finance these FPI schemes comes from unsuspecting borrowers who are charged inflated amounts for FPI by lenders or servicers. Borrowers are required to pay the full amount that the lender or servicer initially pays to the insurer despite the fact that a considerable portion of that amount is kicked back to the lender or servicer in the manner described above. Shellpoint gets the benefit of an effective rebate from the FPI Insurers that it does not pass on to the borrower. Instead, it charges the borrower the full amount, purportedly for the cost of insurance coverage. Lenders and servicers and their exclusive force-placed insurers reap these unconscionable profits entirely at the expense of the unsuspecting borrowers.

40.     During a 2012 hearing on force-placed insurance at the National Association of Insurance Commissioners ("NAIC"), Mr. Birny Birnbaum, an expert on the FPI market, illustrated the staggering growth in profits that FPI schemes have reaped in recent years:[2]

### LPI Premiums Have Quadrupled Since 2004

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|------|------------------------------------|----------------------------------|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004-2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC                              13                                August 9, 2012

41.     It is no surprise that these practices have come under increased scrutiny in recent years by the government and regulators:

- At hearings before the New York Department of Financial Services ("NYDFS") on May 17, 2012 related to the FPI market, the Superintendent of Financial Services, Benjamin Lawsky, stated that the Department's initial inquiry uncovered "serious concerns and red flags" which included:

---

[2] This graph and the ones that follower are from Mr. Birnbaum's presentation to the NAIC on August 9, 2012. The presentation is available at:http://www.naic.org/documents/committees_c_120809-public_hearing_lender_placed-insurancepresentation_birnbaum.pdf.

1) exponentially higher premiums, 2) extraordinarily low loss ratios, 3) lack of competition in the market, and 4) tight relationships between the banks, their subsidiaries, and insurers. He went on to state:

> In sum when you combine [the] close and intricate web of relationships between the banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions . . . .

- In 2013, as a result of its investigation, the NYDFS entered into Consent Order with certain FPI providers that acknowledged that the "commissions" are unearned, noting, in relevant part:

> Commissions paid to affiliates are a form of reverse competition; when insurers compete for servicers' business by offering higher commissions to servicers' affiliates, there is no incentive to reduce force-place insurance premium rates. Commissions are paid to affiliates of servicers because they are a cost of staying in the market, not for any particular work the affiliates perform.

- Similarly, the National Association of Insurance Commissioners (NAIC) has expressed concern with the "reverse competition" at play in the FPI market whereby the insurers compete by offering mortgage lenders and servicers a share in the profits, rather than by offering lower prices. On its website, the NAIC states:

> A key regulatory concern with the growing use of lender-placed insurance is "reverse competition," where the lender chooses the coverage provider and amounts, yet the consumer is obliged to pay the cost of the coverage. Reverse competition is a market condition that tends to drive up prices to the consumers, as the lender is not motivated to select the lower price for coverage since the cost is born by the borrower. Normally competitive forces tend to drive down costs for consumers. However, in this case, the lender is motivated to select coverage from an insurer looking out for the lender's interest rather than the borrower.

*See* http://www.naic.org/cipr_topics/topic_lender_placed_insurance.htm

- The Consumer Financial Protection Bureau's new regulations on FPI became final on January 17, 2013 and prohibit servicers of federally regulated mortgage loans from force-placing insurance unless the servicer has a reasonable basis to the believe the borrower's insurance has lapsed

and require the servicer to provide three notices of the force-placement in advance of issuing the certificate of insurance.[3]

- On December 18, 2013, Fannie Mae issued its Servicing Guide Announcement related to FPI that, among other things, prohibits servicers from including any commissions, bonuses, or other incentive compensation in the amounts charged to borrowers for FPI and further requires that the FPI carrier cannot be an affiliated entity of the servicer.[4]

- In September 2015, an FPI provider, America Modern Insurance Group, and its related entities (together, "American Modern"), entered into a Consent Order[5] with the Florida Office of Insurance Regulation ("FLOIR") after FLOIR discovered massive issues with American Modern's FPI program, the Consent Order prohibited some of the same practices described in this Complaint including:

  o Paying commissions to a bank or servicer or a person or entity affiliated with a bank or servicer on FPI policies obtained by the servicer;
  o Issuing FPI on mortgaged property serviced by a bank or servicer affiliated with American Modern;
  o Reinsuring FPI policies with a captive insurer of any Servicer;
  o Paying contingent commissions based on underwriting profitability or loss ratios to any Servicer or person or entity affiliated with a Servicer;
  o Providing free or below-cost, outsourced services to servicers or their affiliates; and
  o Making any incentive payments, including but not limited to the payment of expenses, to servicers or their affiliates in connection with securing business;

42.    Shellpoint, with OSC and FPI Insurers, operated its FPI scheme in the same manner as in the cases above. Shellpoint's self-dealing and collusion in the FPI market caused substantial harm to the named Plaintiff and the proposed classes she seeks to represent. This class action seeks to redress that harm on behalf of these classes of consumers and to recover all improper costs they have incurred related to the forced placement of insurance by the Defendant.

## FACTUAL ALLEGATIONS

---

[3] *See* Consumer Financial Protection Bureau Proposes Rules to Protect Mortgage Borrowers available at http://www.consumerfinance.gov/pressreleases/consumer-financial-protection-bureau-proposes-rules-to-protect-mortgage-borrowers/
[4] *See* https://www.fanniemae.com/content/announcement/svc1327.pdf
[5] http://www.floir.com/siteDocuments/American_Modern_Insurance_Group_Inc%20_Consent_Order_174210-15-CO.pdf

43.     The standard form mortgage agreements for loans serviced by Shellpoint include a provision requiring the borrower to maintain hazard insurance coverage, flood insurance coverage if the property is located in a Special Flood Hazard Area as determined by the Federal Emergency Management Agency, and wind insurance on the property securing the loan. In the event that the insurance lapses, the standard form mortgage agreements permit Shellpoint to obtain FPI coverage to protect its interest in the loan and to charge the cost of the insurance to the borrower, rather than declare the borrower in default.

44.     What was unknown to borrowers, and not disclosed in the standard form mortgage agreements, was that Shellpoint had exclusive arrangements with OSC and the FPI Insurers to manipulate the FPI market and artificially inflate the charges to Plaintiff and the Class members. The charges were inflated to provide Shellpoint with kickbacks disguised as "commissions," or "expense reimbursements," to provide additional financial benefits in the form of below-cost mortgage servicing functions that were not attributable to the cost of insuring the individual property, or to provide Shellpoint with lucrative reinsurance arrangements that included unmerited charges.

### Defendant's Force-Placed Insurance Scheme

45.     The FPI Insurers and OSC had exclusive arrangements with Shellpoint to monitor Shellpoint's mortgage portfolios, perform various mortgage servicing functions (obligations properly borne by Shellpoint), and provide FPI coverage. In addition to the subsidized mortgage services it received, as set forth in detail below, Shellpoint was "kicked back" a percentage of the force-placed premium.

46.     The scheme worked as follows: Shellpoint purchased a master insurance policy from the FPI Insurers that covered the entire Shellpoint portfolio of mortgage loans. In exchange, the FPI Insurers were given the exclusive right to force-place insurance on property securing a loan within the portfolio when the borrower's voluntary insurance lapses or Shellpoint determined the borrower's existing insurance was inadequate.

47.     OSC and/or the FPI Insurers monitored Shellpoint's entire loan portfolio for lapses in borrowers' insurance coverage. Once a lapse was identified, they sent a cycle of letters/notices, reviewed and approved by Shellpoint, to the borrower in Shellpoint's name, stating that Shellpoint would purchase insurance for the property, for which the borrowers would be financially responsible, and force-place it on the property. In reality, however, the master policy was already

in place and Shellpoint did not seek out and purchase a new policy on the individual borrower's behalf. Rather, a certificate of insurance from the master policy was automatically issued by OSC and the FPI Insurers and Shellpoint was charged for that certificate.

48.   The letters or notices sent to borrowers were done pursuant to an automated system used by the FPI Insurers and OSC that generates and sends the letters at predetermined times. The letters indicated an address for borrowers to submit proof of insurance or correspondence to Shellpoint; however, the address was actually for the FPI Insurer's or Agent's location because they were performing these services for Shellpoint. Each borrower was subject to the automated system and received materially the same letters described above.

49.   Once a certificate was issued pursuant to the pre-existing master policy, coverage was forced on the property, and Shellpoint charged the borrower an amount they attribute to the "cost" of the FPI, which was either deducted from the borrower's mortgage escrow account or added to the balance of the borrower's loan.[6] The borrower's escrow account was depleted irrespective of whether other escrow charges, such as property taxes, were also due and owing.

50.   No individualized underwriting ever takes place for the force-placed coverage. Insurance was automatically placed on the property and the inflated amounts, including the unlawful kickbacks, were charged to the borrower.

51.   To fund the FPI scheme, Shellpoint paid for the certificate of insurance, which issued from the already-existing master policy. Shellpoint, not the borrower, was obligated to pay the FPI Insurers for the FPI pursuant to the agreements between Defendant, which governed the mortgage servicing functions that the FPI Insurers and OSC perform as well as the procurement of the master policy, and were executed and already in place before the borrower's coverage lapses.

52.   Once the certificate was issued and Shellpoint paid for the insurance, the FPI Insurers or OSC kicked back a set percentage of the premium to Shellpoint as a "commission" or an "expense reimbursement." The money paid back to Shellpoint and/or its affiliates was not given in exchange for any services provided by it; it was simply grease paid to keep the FPI machine moving. In an attempt to mask the kickbacks as legitimate, the FPI Insurers or OSC may disclose in the form letters sent to the borrower that Shellpoint may earn "commissions" as a result of the forced placement of new coverage, that Shellpoint incurred "costs" as a result of the force-

---

[6] On some occasions, when a borrower does not have an escrow account, Shellpoint creates an escrow account with a negative balance and charged the borrower to bring the balance to zero.

placement of insurance, or that a "fee" was due to an agency. Above, Plaintiff illustrated how OSC's employees hid commissions form the public.

53.     These payments were not compensation for work performed; they were an effective rebate on the premium amount owed by Shellpoint, reducing the cost of coverage that Shellpoint paid to the FPI Insurers. The "commissions" or "expense reimbursements" were not legitimate reimbursements for actual costs, nor were they payments that have been earned for any work done by Shellpoint or an affiliate related to the placement of the insurance; they were unlawful kickbacks to Shellpoint for the exclusive arrangement to force-place insurance.

54.     In reality, no work was ever done by Shellpoint to procure insurance for a particular borrower because the coverage came through the master policy already in place, and the procedures, including the issuance of the certificate of insurance, were automated. Shellpoint did not seek out insurance policies on a borrower's behalf and had no involvement in the placing of the insurance. As a result, the amount paid was not a true "commission," no income was "earned," and Shellpoint did not incur any "expenses" in relation to the force-placement of insurance for any particular borrower.

55.     In addition to these direct payment kickbacks, Shellpoint also entered into exclusive agreements whereby the FPI Insurers and OSC provided below-cost mortgage servicing functions on Shellpoint's entire loan portfolio. These functions, which included, but were not limited to, activities such as "new loan boarding," "escrow administration," "customer service," and "loss draft services," were often not related to the provision of FPI and were performed at below-cost as a way to keep the exclusive arrangement in place. Indeed, the FPI Insurers and OSC did not perform these services for Shellpoint without also being the exclusive provider of FPI.

56.     OSC did not perform these services for Shellpoint without also being the exclusive vendor for the procurement of force-placed insurance. OSC's Vice President of Accounting testified that the commissions for agents to pass through for these types of master policies were extremely lucrative. Master policies are "for one-year periods" and, commission rates for agents could change from "one year to the next depending on what we can get from them up front." Exhibit B at 172 "Depending on which carrier, the commissions could be "25 percent, 33, 35." *Id*.

57.     Upon information and belief, OSC and the FPI Insurers were able to perform many of the mortgage servicing functions for Shellpoint at below-cost because of the funds received from the FPI charges, which subsidized any expenses incurred for performing the services.

58.     The borrower ultimately subsidizes the below-cost mortgage servicing through the inflated charges for FPI imposed by Shellpoint. However, because insurance-lapsed, mortgaged property generally comprises only 1-2% of the lenders' total mortgage portfolio, the borrowers, like Plaintiff here, who were charged for the FPI unfairly bore the cost to service and monitor the entire Shellpoint loan portfolio. These charges, passed on to Plaintiff and the proposed classes, were not properly chargeable to the borrowers because they were expenses associated with the servicing of all the loans and often had nothing to do with the provision of FPI, and Shellpoint was already compensated for these activities by the owners of the loans (e.g. Fannie Mae).

59.     Thus, the small percentage of borrowers who were charged for FPI subsidize the costs of servicing Shellpoint's entire loan portfolio, effectively resulting in a kickback to Shellpoint to keep its exclusive arrangement in place with OSC and the FPI Insurers.

60.     In addition, upon information and belief, the FPI Insurers can also enter into essentially riskless "captive reinsurance arrangements" with Shellpoint or its affiliates, to "reinsure" the property insurance force-placed on borrowers. An *American Banker* article illustrated this reinsurance problem using JPMorgan Chase's program with Assurant, Inc. by way of example:

> JPMorgan and other mortgage servicers reinsure the property insurance they buy on behalf of mortgage borrowers who have stopped paying for their own coverage. In JPMorgan's case, 75% of the total force-placed premiums cycle back to the bank through a reinsurance affiliate. This has raised further questions about the force-placed market's arrangements.

Over the last five years, Chase has received $660 million in reinsurance payments and commissions on force-placed policies, according to New York's DFS[.]

> Of every hundred dollars in premiums that JPMorgan Chase borrowers pay to Assurant, the bank ends up keeping $58 in profit, DFS staff asserted. The agency suggested the bank's stake in force-placed insurance may encourage it to accept unjustifiably high prices by Assurant and to avoid filing claims on behalf of borrowers, since that would lower its reinsurer's returns.

> The DFS staff also questioned the lack of competition in the industry, noting that Assurant and QBE have undertaken acquisitions that give them long-term control of 90% of the market. Further limiting competition are the companies' tendency to file identical rates in many states, Lawsky and his staff argue.

J. Horwitz, *Chase Reinsurance Deals Draw New York Regulator's Attacks*, AM. BANKER, May18, 2012, *available at* http://www.americanbanker.com/issues/177_97/chase-reinsurance-deals- regulator-attack-1049460-1.html.

61.     If Shellpoint engaged in a reinsurance program, like those of other servicers, it would simply be a way to funnel profits from the FPI scheme, in the form of ceded premiums, to Shellpoint at borrowers' expense. While reinsurance can, and often does, serve a legitimate purpose, here it did not. Shellpoint and/or its affiliates entered into reinsurance agreements with the FPI Insurers that provided that the insurer would return to Shellpoint significant percentages of the premiums charged to borrowers by way of ceded reinsurance premiums to Shellpoint affiliates – which in turn provided these premiums to Shellpoint, often in the form of "soft-dollar" or other credits. The ceded premiums were nothing more than a kickback and a method for Shellpoint to profit from the forced placement of new coverage because they would not assume any real risk.

62.     The amounts charged to borrowers were also inflated by the interest that accrues on the amounts owed for force-placed coverage. When Shellpoint added the cost of the high-price force-placed insurance to a homeowner's mortgage balance, it thereby increased the interest paid over the life of the loan by the homeowner to the lender.

63.     The actions and practices described above are unconscionable and were undertaken in bad faith with the sole objective to maximize Defendant's profits at the expense of Plaintiff and the other Class members. Borrowers who for whatever reason stopped paying for insurance or were under-insured on mortgaged property, were charged inflated and illegitimate, noncompetitive amounts for force-placed insurance. These charges were inflated to finance undisclosed kickbacks to Shellpoint or its affiliates (who, as described above, perform little, if any, work related to the forced placement of the individual policies), as well as the cost of captive reinsurance arrangements and the provision of below-cost mortgage servicing functions.

64.     Borrowers have no say in the selection of the FPI carrier or the terms of the FPI policies, and have no ability to seek out and purchase their own FPI policy. FPI policies are commercial insurance policies intended to be sold to lenders and servicers, and their terms are determined by the lender and/or servicer, here, Shellpoint and the FPI providers, here, OSC and FPI Insurers. Further, it was Shellpoint and not the borrower that was the Named Insured on the FPI policies. The single interest polices provided much less value to the borrowers.

65.     Plaintiff does not challenge Shellpoint's right to force place insurance in the first instance. She challenges the discretion afforded mortgage lenders and servicers in purchasing force-placed insurance, as well as Defendant's manipulation of the force-placed insurance market whereby the FPI Insurers and OSC provided kickbacks to Shellpoint to keep the exclusive arrangement in place. These kickbacks provided an effective rebate to Shellpoint on the purchase of the FPI that Shellpoint did not pass on to the borrower. Servicers, like Shellpoint, are financially motivated to select the insurer, like the FPI Insurers, that offers the best financial benefit in the terms of "commissions," "expense reimbursements," direct payments, discounted mortgage servicing, or debt forgiveness.

66.     This action is brought to put an end to Defendant's exclusive, collusive, and uncompetitive arrangements, and to recover for Plaintiff the excess amounts charged to her beyond the true cost of insurance coverage. Plaintiff seeks to recover the improper charges passed on to her and other Shellpoint borrowers nationwide through her claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and TILA.

### Plaintiff Dorothy Kerr Checa Chong

67.     Plaintiff took a mortgage loan from BNY Mellon, secured by a mortgage on real property at 4226 Tranquility Drive, Highland Beach, Florida 33487. At all times relevant to the allegations herein, Plaintiff's mortgage loan was owned and/or serviced by Shellpoint.

68.     Plaintiff's mortgage provides as follows:

5. **Property Insurance**. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.

* * * *

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage that was previously in effect. Borrower acknowledges that the cost of the

insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

       * * * *

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument . . . then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument[.]

       * * * *

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

Plaintiff's mortgage is attached here as Exhibit C.

69.     Subsequently, the Mortgage was assigned to Shellpoint.

70.     Plaintiff's voluntary insurance lapsed.

71.     Pursuant to the automated procedures in place, on August 3, 2014, a letter purporting to come "from Shellpoint Mortgage Servicing, a division of New Penn Financial, LLC" was sent to Plaintiff informing her that Shellpoint "purchased" a flood insurance policy on Plaintiff's behalf. The letter stated that a declarations page was attached and that page explained "the amount of coverage purchased on your behalf" and "its cost." The flood policy allegedly "purchased" actually came from the master policy entered into with Certain Underwriters at Lloyd's London, with OSC as the agent, included a surplus lines tax, and a total cost of $4,407.48.

72.     The letter above did not disclose any aspect of the secret and illegal compensation arrangement entered into by the FPI Insurers, OSC, and Shellpoint, or inform Plaintiff that she would be charged illegitimate amounts beyond what Shellpoint actually paid for the cost of coverage. Nor did the letter disclose to Plaintiff that the amounts being charged to her would be inflated to subsidize the cost of OSC or the FPI Insurers performing mortgage servicing functions for Shellpoint that have little or nothing to do with the provision of the force-placed insurance.

73.     The communications to Plaintiff were false and misleading. Shellpoint represented in the letter that it was charging her the amounts paid for the "cost" of the insurance. However, the

charges imposed on Plaintiff did not reflect Shellpoint's true cost of coverage because Shellpoint was receiving an effective rebate on the force-placed insurance through the kickback scheme described above. Shellpoint, therefore, paid less for coverage than it represented to and charged Plaintiff and the Class members.

74.     The communication to Plaintiff was also misleading in that it represented that Shellpoint would "buy" or had "bought" or "purchased" the individual insurance for Plaintiff's property when an exclusive arrangement and master policy was already in place with the FPI Insurers, and Shellpoint did not in fact, perform any additional work to procure coverage for Plaintiff's property.

75.     It was never disclosed to Plaintiff or to the putative Class members that because of Shellpoint's kickback scheme, Shellpoint would be receiving a rebate and effectively be paying less for the FPI coverage than it would charge Plaintiff and the putative class. Nor was it disclosed to Plaintiff or the Class members that the amounts charged to them covered other illegitimate kickbacks and below-cost mortgage servicing functions not properly charged to them.

76.     There were no material differences between Shellpoint's actions and practices directed to Plaintiff and its actions and practices directed to the Class.

<b><u>CLASS ALLEGATIONS</u></b>

**A. <u>Class Definitions</u>**

77.     Plaintiff brings this action against Shellpoint pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and all other persons similarly situated. Plaintiff seeks to represent the following class:

> All borrowers in the United States who, from March 1, 2014 to the present, were charged by Shellpoint under a hazard, flood, or wind LPI policy, procured by Overby-Seawell Company on or after March 1, 2014 for Residential Property, and who, within the Class Period, either (i) paid to Shellpoint the Net Premium for that LPI Policy or (ii) did not pay to and still owe Shellpoint the Net Premium for that LPI Policy. Excluded from the Class are:  (i) individuals who are or were during the Class Period officers or directors of the Defendants or any of their respective affiliates; (ii) any justice, judge, or magistrate judge of the United States or any State, their spouses, and persons within the third degree of relationship to either of them, or the spouses of such persons; (iii) borrowers who only had an LPI Policy that was cancelled in its entirety such that any premiums charged and/or collected were fully refunded to the borrower or the borrower's escrow account; (iv) all borrowers for whom a final foreclosure judgment, foreclosing the mortgage loan

serviced by Shellpoint, was entered against them; and (v) all borrowers
who file a timely and proper request to be excluded from the Class.

78.     Plaintiff reserves the right to modify or amend the definition of the proposed
Classes before the Court determines whether certification is appropriate.

79.     Defendant subjected Plaintiff and the respective Class members to the same unfair,
unlawful, and deceptive practices and harmed them in the same manner.

**B. <u>Numerosity</u>**

80.     The proposed classes are so numerous that joinder of all members would be
impracticable. Defendant sells and service hundreds of thousands of mortgage loans and insurance
policies in the State of Florida, and nationwide. The individual Class members are ascertainable,
as the names and addresses of all Class members can be identified in the business records
maintained by Defendant. The precise number of Class members number at least in the thousands
and can only be obtained through discovery, but the numbers are clearly more than can be
consolidated in one complaint such that it would be impractical for each member to bring suit
individually. Plaintiff does not anticipate any difficulties in the management of the action as a class
action.

**C. <u>Commonality</u>**

81.     There are questions of law and fact that are common to Plaintiff's and Class
members' claims. These common questions predominate over any questions that go particularly
to any individual member of the Classes. Among such common questions of law and fact are the
following:

a.   Whether Shellpoint breached its mortgage contracts with Plaintiff and the
Class by selecting higher-priced FPI policies in order to receive illegal
kickbacks (in the form of unwarranted commissions, expense reimbursements,
below-cost mortgage servicing, or reinsurance payments) and by charging the
higher cost to Plaintiff and the Class members;

b.   Whether Shellpoint breached the implied covenant of good faith and fair
dealing by entering into exclusive arrangements with OSC and FPI Insurers
and/or their affiliates, which resulted in inflated amounts being charged to
Plaintiff and the Class members;

c.   Whether Shellpoint manipulated the FPI procurement process in order to
maximize its profits to the detriment of Plaintiff and the Class members;

d.  Whether Shellpoint or its affiliates performed any work or services in exchange for the "commissions" or other forms of kickbacks it collected;

e.  Whether the "expense reimbursements" received by Shellpoint were for true expenses or were just kickbacks pursuant to its exclusive relationship with OSC and the FPI Insurers;

f. Whether Shellpoint's charges were inflated to compensate for mortgage servicing activities that OSC and/or the FPI Insurers and its affiliates provided to Shellpoint, and which were not chargeable to Plaintiff and the Class members under the terms of their mortgages;

g. Whether the charges were inflated to include the cost of an unlawful captive reinsurance arrangement;

h. Whether Shellpoint employed an unconscionable commercial practice, misrepresentation, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission by their arrangement, which incentivized Shellpoint to charge inflated and unnecessary fees for FPI, and therefore violated FDUTPA;

i. Whether an objective consumer would be deceived by Shellpoint's FPI arrangement, whereby Shellpoint paid a reduced amount for FPI but charged its borrowers an inflated amount to cover the kickbacks it received while representing that it was only charging the cost of insurance coverage, and therefore violated FDUTPA;

j.  Whether there was actually a transfer of risk under Defendant's purported reinsurance arrangement;

k.  Whether Defendant has been unjustly enriched at the expense of Plaintiff and the Class;

l. Whether Shellpoint violated TILA by failing to disclose kickbacks charged to Plaintiff and the Class members in their mortgages;

m. Whether the FPI Insurers and OSC intentionally and unjustifiably interfered with Plaintiff's and the Class members' rights under the mortgage contracts by paying kickbacks and providing free or below-cost mortgage servicing functions to Shellpoint or its affiliates thereby inducing a breach of the contract;

n. Whether Plaintiff and the Class members are entitled to damages and/or injunctive relief as a result of Defendant's conduct.

### D. **Typicality**

82.     Plaintiff is a member of the Classes she seeks to represent. Plaintiff's claims are typical of the respective classes' claims because of the similarity, uniformity, and common purpose of Defendant's unlawful conduct. Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiff as a result of Defendant's wrongful conduct.

### E. **Adequacy of Representation**

83.     Plaintiff is an adequate representative of the Classes she seeks to represent and will fairly and adequately protect the interests of the Classes. Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent her. There is no hostility between Plaintiff and the unnamed Class members. Plaintiff anticipates no difficulty in the management of this litigation as a Class action.

84.     To prosecute this case, Plaintiff has chosen the undersigned law firm, which is very experienced in class action litigation and has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

### F. **Requirements of Fed. R. Civ. P. 23(b)(3)**

85.     The questions of law or fact common to Plaintiff's and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class. All claims by Plaintiff and the unnamed Class members are based on the FPI policies that Shellpoint unlawfully imposed and its deceptive and egregious actions involved in imposing the charges for the force-placed policies.

86.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

87.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is in the case at bar, common questions will be held to predominate over individual questions.

### G. **Superiority**

88.     A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside all across the country;

(b) Individual claims by Class members are impractical because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**H. Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

89.     Prosecuting separate actions by or against individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class.

90.     Shellpoint has acted or failed to act in a manner generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

## COUNT I
## BREACH OF CONTRACT

91.     Plaintiff re-alleges and incorporates paragraphs 1-90 above as if fully set forth herein and further alleges as follows.

92.     Plaintiff and all similarly situated Class members have mortgages that were owned and/or serviced by Shellpoint.

93.     Plaintiff's and these Class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding force-placed insurance requirements and its placement by Shellpoint. The force-placed provisions from Plaintiff's mortgage are set forth above and a true and correct copy of the mortgage agreement is attached to this complaint as **Exhibit C**.

94.     Plaintiff's mortgage requires that she maintain insurance on her property and provides that if she should fail to do so, Shellpoint might obtain insurance coverage to protect its

interest in the property, "force place" the coverage, and charge the borrower the "cost of the insurance coverage." Plaintiff's mortgage further provides that Shellpoint may do and pay for whatever is reasonable or appropriate to protect its interest in the property and rights under the mortgage agreement, including protecting and/or assessing the value of the property and securing and/or repairing the property.

95.     Shellpoint charged borrowers amounts for FPI that were more than the actual amount it paid OSC and/or the FPI Insurers for the coverage because the charges included unearned "commissions" or "expense reimbursements" and other kickbacks, as well as subsidies for below-cost mortgage servicing functions that had little or nothing to do with the placement of FPI. These costs were not costs of coverage, and were not applied to protecting Shellpoint's rights or risk in the collateral for borrowers' mortgage loans. They were simply bribes to keep the exclusive relationship with OSC in place.

96.     Through the kickbacks it received, Shellpoint paid less for OSC procured force-placed coverage than it charged to Plaintiff and other Class members.

97.      Shellpoint breached the mortgage agreements by, among other things, charging Plaintiff and absent class members the amounts beyond the actual cost of coverage and more than what was reasonable or appropriate to protect its interest in the property.

98.     Plaintiff and the Class members have suffered damages as a result of Shellpoint's breach of contract.

**WHEREFORE**, Plaintiff, on behalf of herself and all similarly situated Class members, seeks compensatory damages resulting from Shellpoint's breach of contract, as well as injunctive relief preventing it from further violating the terms of the mortgages. Plaintiff further seeks all relief deemed appropriate by this Court, including attorneys' fees and costs.

<u>COUNT II</u>

<u>BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING</u>

99.     Plaintiff re-alleges and incorporates paragraphs 1-90 above as if fully set forth herein and further alleges as follows.

100.    A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance. Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

101.    Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

102.    Plaintiff's and the Class members' mortgage contracts allowed Shellpoint to force-place insurance coverage on borrowers in the event of a lapse in coverage, but did not define standards for selecting an insurer or procuring an insurance policy.

103.    Shellpoint was afforded substantial discretion in force-placing insurance coverage. It was permitted to unilaterally choose the company from which it purchased force-placed insurance and negotiate the price of the coverage it procured without restriction. Shellpoint had an obligation to exercise its discretion in good faith, and not capriciously or in bad faith.

104.    The purpose of the mortgage clause allowing a servicer, like Shellpoint, to force-place insurance is to protect the servicer's interest in the property that is collateral for the mortgage loan. Shellpoint breached the implied covenant of good faith and fair dealing by making additional profits at Plaintiff's expense through force-placing insurance on the property and receiving kickbacks on that OSC-procured insurance that bore no relation to protecting its interest in the property.

105.    Shellpoint further breached the implied covenant of good faith and fair dealing by, among other things:

(a) Manipulating the FPI market by selecting insurers that would artificially inflate premiums to include kickbacks to Shellpoint not necessary to cover Shellpoint's risk;

(b) Exercising its discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting FPI policies with artificially-inflated premiums to maximize Shellpoint's own profits;

(c) Assessing inflated and unnecessary charges against Plaintiff and the Classes which Shellpoint attributes to the cost of the insurance coverage;

(d) Receiving an effective rebate on the FPI through the kickback scheme but not passing on that rebate to the borrowers, thereby creating the incentive to seek the highest-priced premiums possible;

(e) Charging Plaintiff and the Classes for "commissions" or "expense reimbursements" when the insurance was prearranged and no commission was

earned or due and no expenses were incurred in placing the certificate of insurance;

(f) Charging Plaintiff and the Classes the cost of having OSC and the FPI Insurers perform its obligation of servicing its entire mortgage portfolio, which was not properly chargeable to Plaintiff or the Classes;

(g) Force-placing insurance coverage that was duplicative of existing coverage, or in excess of what was required by borrowers' mortgage agreements;

(h) Seeking out a force-placed insurance insurer that provided it the best deal in terms kickbacks and below-cost mortgage servicing functions with the knowledge that these functions will be subsidized by the amounts paid for force-placed insurance;

(i) Force-placing insurance coverage in excess of that required to cover its interest in the property; and/or

(j) Charging Plaintiff and the Classes an inflated charge for the force-placed insurance due to the captive reinsurance arrangement.

106.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff and the Class members have suffered damages.

**WHEREFORE**, Plaintiff, on behalf of herself and all similarly situated Class members, seeks a judicial declaration that Shellpoint's conduct described above and the amounts charged to borrowers are in contravention of Shellpoint's duties of good faith and fair dealing. Plaintiff also seeks compensatory damages resulting from Shellpoint's breaches of its duties. Plaintiff further seeks all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT III
## VIOLATION OF THE FLORIDA DECEPTIVE
##  AND UNFAIR TRADE PRACTICES ACT

107.    Plaintiff re-alleges and incorporates paragraphs 1-90 above as if fully set forth herein and further alleges as follows.

108.    FDUTPA, section 501.201, *et seq.*, Florida Statutes, prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204, Fla. Stat.

109.     Plaintiff and the Florida Subclass[7] are "consumers" as that term is defined in section 501.203(7), Florida Statutes.

110.     Shellpoint has engaged in, and, upon information and belief, continues to engage in, unconscionable acts or practices and has engaged in unfair or deceptive acts in the conduct of its trade and/or commerce in the State of Florida.

111.     The policies, acts, and practices alleged herein were intended to result and did result in the payment of inflated charges for force-placed insurance by Plaintiff and the Florida Subclass, which in turn were intended to generate unlawful or unfair compensation for Shellpoint.

112.     Specifically, Shellpoint had an exclusive relationship with OSC and the FPI Insurers, whereby it would pay unreasonable and inflated premiums for force-placed insurance policies, charge that amount to Plaintiff and the Florida Subclass, and then receive compensation through kickbacks, discounted mortgage services, or captive reinsurance arrangements that resulted in an effective rebate for Shellpoint that was never passed on to Plaintiff and the Florida Class members.

113.     Shellpoint's conduct of charging inflated amounts for the force-placed coverage to Plaintiff and members of the Florida Subclass violates FDUTPA and was conceived, devised, planned, implemented, approved, and executed within the State of Florida, which has an interest in prohibiting violations of FDUTPA.

114.     Shellpoint is not a bank or savings and loan association regulated by the Florida Office of Financial Regulation of the Financial Services Commission. Further, it is not a bank or savings and loan association regulated by federal agencies.

115.     Plaintiff and the Florida Subclass have sustained actual damages as a direct and proximate result of Shellpoint's unfair and unconscionable practices. Section 501.211(2), Florida Statutes, provides Plaintiff and the Florida Subclass a private right of action against these Defendant and entitles them to recover their actual damages, plus attorneys' fees and costs.

116.     Plaintiff and the Florida Subclass have suffered and will continue to suffer irreparable harm if Shellpoint continues to engage in such deceptive, unfair, and unreasonable practices.

---

[7] "Florida Subclass" references members of the "Class" as pled above who own affected properties in Florida.

**WHEREFORE,** Plaintiff, on behalf of herself and the Florida Subclass, demands judgment against Shellpoint for compensatory damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

## COUNT IV

## UNJUST ENRICHMENT[8]

117.    Plaintiff re-alleges and incorporates paragraphs 1-90 above as if fully set forth herein and further alleges as follows.

118.    Shellpoint received a rebate on the cost of the force-placed insurance coverage but does not pass that rebate on to its borrowers. The rebates were provided to Shellpoint in the form of unwarranted kickbacks, including "expense reimbursements" or "commissions," captive reinsurance arrangements, and free or below-cost mortgage servicing functions. These benefits to Shellpoint were paid through the amounts charged to Plaintiff and the Class members for FPI.

119.    Shellpoint entered into an agreement whereby the insurance vendors – the FPI Insurers and OSC – would provide below-cost mortgage servicing activities and cover Shellpoint's entire portfolio of loans with a master policy and issue certificates of insurance when a borrower's voluntary policy lapsed. Shellpoint would then charge Plaintiff and the Class amounts for the FPI that had been artificially inflated to include the kickbacks described above and then retain the amounts of those kickbacks for itself. The FPI policies imposed on borrowers therefore cost less than what Shellpoint had actually paid for them.

120.    Commissions or kickbacks were paid directly to Shellpoint or its affiliates in order to be able to exclusively provide FPI policies. The FPI Insurers and OSC were mere conduits for the delivery of the kickbacks and improper rebates to Shellpoint or its affiliates.

121.    These payments directly benefitted Shellpoint and were taken to the detriment of the borrower. The kickbacks (in the form of expense reimbursements, commissions, reinsurance arrangements, or subsidized mortgage servicing functions) were subsumed into the charges to borrowers for the FPI and ultimately paid by them. Therefore, Shellpoint had the incentive to seek out unreasonably inflated prices for the FPI and charge the inflated amounts to borrowers.

---

[8] Plaintiff pleads her unjust enrichment claim against Shellpoint in the alternative to her contractual claims against it.

122.    Further, Shellpoint was unjustly enriched through financial benefits in the form of increased interest income when the amounts for the FPI policies were added to the Class members' mortgage loans.

123.    As a result, Plaintiff and the Class members have conferred a benefit on Shellpoint.

124.    Shellpoint had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on it.

125.    Had Plaintiff known the true facts behind Shellpoint's FPI scheme with OSC and the FPI Insurers, that the charges from Shellpoint included the kickbacks described above, and that Shellpoint was receiving an effective rebate on the charges but not passing on that rebate to her, she would have expected remuneration from Shellpoint.

126.    Shellpoint would be unjustly enriched if it is allowed to retain the aforementioned benefits, and each Class member is entitled to recover the amount by which Shellpoint was unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiff, on behalf of herself and all similarly situated Class members, demands an award against Shellpoint in the amounts by which it has been unjustly enriched at Plaintiff's and the Class Members' expense, and such other relief as this Court deems just and proper.

## COUNT V

## VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601, et seq.

127.    Plaintiff re-alleges and incorporates paragraphs 1-90 above as if fully set forth herein and further alleges as follows.

128.    Plaintiff's and the Class Members' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of the Truth in Lending Act ("TILA"), 15 U.S.C.§ 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

129.    Shellpoint is a "creditor" as defined by TILA because it owned or serviced Plaintiff's mortgages and changed the terms of the mortgage so as to create a new mortgage obligation, of which Shellpoint was the creditor.

130.    Pursuant to TILA, Shellpoint was required to accurately and fully disclose the terms of the legal obligations between the parties. *See* 12 C.F.R. § 226.17(c).

131.    Shellpoint violated TILA, specifically 12 C.F.R. § 226.17(c), when it: (i) added force-placed insurance charges to Plaintiff's mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickback, reinsurance, discount loan servicing, and/or other profiteering involving Shellpoint and/or its affiliates as a result of the purchase of force-placed insurance.

132.    When Shellpoint changed the terms of Plaintiff's mortgage to allow previously unauthorized kickbacks and insurance amounts in excess of its interests in the property, it changed the finance charge and the total amount of indebtedness, extended new and additional credit through force-placed insurance charges, and thus created a new debt obligation. Under TILA, Shellpoint was then required to provide a new set of disclosures showing the amount of the insurance charges (i.e. finance charges) and all components thereof. On information and belief, to the extent a borrower cannot pay the expense up front, Shellpoint increases the principal amount under Plaintiff's and Class Member's mortgages when it force-places the insurance, which was a new debt obligation for which new disclosures were required.

133.    Shellpoint adversely changed the terms of Plaintiff's loans after origination in order to allow a kickback on the FPI charges. These kickbacks are not authorized in the mortgage in any clear and unambiguous way. Shellpoint never disclosed to borrowers the amount of the "commissions," "expense reimbursements," or other unearned profits paid to it or its affiliates.

134.    Shellpoint also violated TILA by adversely changing the terms of Plaintiff's loan after origination by requiring and threatening to force-place more insurance than necessary to protect its interest in the property securing the mortgages.

135.    Acts constituting violations of TILA occurred within one year prior to the filing of the original Complaint in this action, or are subject to equitable tolling because Shellpoint's kickbacks, reinsurance, and other unearned revenue-generating scheme was the subject of secret agreements among it and its affiliates and was concealed from borrowers.

136.    Plaintiff and Class members have been injured and have suffered a monetary loss arising from Shellpoint's violations of TILA.

137.    As a result of Shellpoint's TILA violations, Plaintiff and Class members are entitled to recover actual damages and a penalty of $500,000.00 or 1% of Shellpoint's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

138.    Plaintiff and Class members are also entitled to recovery of attorneys' fees and costs to be paid by Shellpoint, as provided by 15 U.S.C. § 1640(a)(3).

**WHEREFORE**, Plaintiff, on behalf of herself and all Class members similarly situated, seeks a judgment in her favor against Shellpoint awarding actual damages and a penalty of $500,000.00 or 1% of Shellpoint's net worth, as provided by 15 U.S.C. §1640(a)(1)-(2), as well as of attorneys' fees and costs to be paid by Shellpoint, as provided by 15 U.S.C. § 1640(a)(3).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and all similarly situated individuals, demands judgment against Shellpoint as follows:

1)    Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2), or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiff and her counsel to be representatives of the Class sought in this complaint;

2)    Enjoining Defendant from continuing the acts and practices described above;

3)    Awarding damages sustained by Plaintiff and the Class members as a result of Shellpoint's breaches of the subject mortgage contracts and the implied covenant of good faith and fair dealing, together with pre-judgment interest;

4)    Finding that Shellpoint has been unjustly enriched and requiring it to refund all unjust benefits to Plaintiff and the Class, together with pre-judgment interest;

5)    Awarding Plaintiff and the Florida Subclass damages, injunctive relief, declaratory relief, attorneys' fees, and costs under FDUTPA;

6)    Awarding Plaintiff and Class members costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Classes' counsel and experts, and reimbursement of expenses;

7)    Awarding actual damages and a penalty of $500,000 or 1% of Shellpoint's net worth as provided by 15 U.S.C. § 1640 (a)(1)-(2), and attorneys' fees and costs as provided by 15 U.S.C. § 1640 (a)(3);

8)    Awarding such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff and the Classes request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 19th day of March, 2019.

By: *s/ Adam Moskowitz*
Adam Moskowitz, Esq.
Florida Bar No. 984280
Email: adam@moskowitz-law.com
Howard M. Bushman, Esq.
Florida Bar No. 0364230
Email: howard@moskowitz-law.com
Joseph M. Kaye, Esq.
Florida Bar No. 117520
Email: joseph@moskowitz-law.com
**The Moskowitz Law Firm, PLLC**
2 Alhambra Plaza
Suite 601
Coral Gables, FL 33134
Telephone: 305 740-1423
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was filed electronically via CM/ECF on the 19th day of March, 2019 and served by the same means on all counsel of record.

By: */s/ Adam Moskowitz*____
Adam M. Moskowitz
